UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x

TRUSTEES OF THE PLUMBERS LOCAL   :
UNION NO. 1 WELFARE FUND,           :
ADDITIONAL SECURITY BENEFIT FUND, :
VACATION & HOLIDAY FUND, TRADE   :
EDUCATION FUND, 401(K) SAVINGS    :
PLAN, TRUSTEES OF THE UNITED      :
ASSOCIATION NATIONAL PENSION    :
FUND, and TRUSTEES OF THE         :
INTERNATIONAL TRAINING FUND,    :
                                  :
                  Plaintiffs,   :
                                  :
          -against-           :
                                  :
TRI-C MECHANICAL INC. and         :
PHILADELPHIA INDEMNITY INSURANCE :
COMPANY,                       :
                                  :
                  Defendants.  :
------------------------------------------------------------- x

**REPORT AND RECOMMENDATION**

**22-CV-1590 (AMD) (PK)**

**Peggy Kuo, United States Magistrate Judge:**

      The Trustees of the Plumbers Local Union No. 1 Welfare Fund, Additional Security Benefit Fund, Vacation & Holiday Fund, Trade Education Fund, and 401(k) Savings Plan (collectively, the "Local 1 Funds"), the Trustees of the United Association National Pension Fund (the "UANPF"), and the Trustees of the International Training Fund (the "ITF," together with the UANPF, the "National Funds") (the Local 1 Funds and the National Funds together referred to as "Plaintiffs" or the "Funds") brought this action against Defendants Tri-C Mechanical Inc. ("Tri-C") and Philadelphia Indemnity Insurance Company ("PIIC")[1] pursuant to the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(3), 1145, and Section 301 of the Labor Management

---

[1] The action was dismissed as to Defendant PIIC on September 26, 2022, pursuant to a stipulation of dismissal filed on September 23, 2022.  (Dkt. 24.)

Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185, *et seq.*, seeking to recover contributions and deferrals to employee benefit funds that Tri-C has failed to pay them. (*See* Am. Compl., Dkt. 7.)

Before me on referral from the Honorable Ann M. Donnelly is Plaintiffs' Motion for Default Judgment against Tri-C (the "Motion") dated October 5, 2023. (*See* Motion, Dkt. 42.) For the reasons stated herein, I respectfully recommend that the Motion be granted and that damages be awarded, as described below.

## FACTUAL BACKGROUND

### I.    Collective Bargaining Agreement Between Tri-C and the Union

Defendant Tri-C is a corporation incorporated in the State of New York with its principal place of business at 318 Meacham Avenue, Elmont, New York 11003. (Am. Compl. ¶ 8.) Tri-C is in the subcontracting business and does work primarily with mechanical and plumbing contractors. Tri-C entered into a series of Collective Bargaining Agreements ("CBA") with the Local Union No. 1 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada (the "Union"). (Am. Compl. ¶ 10.)

On June 26, 2019, Tri-C executed a Building Trade Agreement CBA with the Union effective July 1, 2016 through June 30, 2020 (the "2016-2020 BT CBA"). (Declaration of Walter Saraceni ("Saraceni Decl.") ¶ 4, Dkt. 43; *see* Ex. B to Saraceni Decl. ("2016-2020 BT CBA"), Dkt. 43-2.) Tri-C agreed to be bound to the 2016-2020 BT CBA through June 30, 2020 and during each year thereafter unless either party served written notice of termination or proposed changes on the other party. (2016-2020 BT CBA at 75.) Neither party has served written notice of termination at any time on the other party, and thus both parties remain bound to the 2016-2020 BT CBA as well as the successive CBA (the "2020-2023 BT CBA," together with the 2016-2020 BT CBA, the "BT CBAs"). (Saraceni Decl. ¶¶ 7, 11, 12; Ex. C to Saraceni Decl. ("2020-2023 BT CBA"), Dkt. 43-3)

On June 26, 2019, Tri-C also executed an Independent Mechanical Equipment and Service

Division Collective Bargaining Agreement with the Union effective October 1, 2016 through September 30, 2019 (the "2016-2019 MES CBA"). (Saraceni Decl. ¶ 8; *see* Ex. D to Saraceni Decl. ("2016-2019 MES CBA"), Dkt. 43-4.) Tri-C agreed to be bound to the 2016-2019 MES CBA through September 30, 2019 and during each year thereafter unless either party served written notice of termination or proposed changes on either party. (2016-2019 MES CBA at 32.) Neither party has served written notice of termination at any time on the other party, and thus both parties remain bound to the 2016-2019 MES CBA, as well as the successive CBA (the "2019-2022 MES CBA," together with the 2016-2019 MES CBA, the "MES CBAs," collectively with the BT CBAs, the "CBAs."). (Saraceni Decl. ¶¶ 7, 11; Ex. E to Saraceni Decl. ("2019-2022 MES CBA"), Dkt. 43-5.)

The CBAs require Tri-C to submit remittance reports detailing hours worked and amounts owed and to pay contributions to the Funds at rates specified therein for all work performed within the trade and geographical jurisdiction of the Union ("Covered Work"). (Am. Compl. ¶¶ 16-17; BT CBAs Art. 2; MES CBAs Art. III-IV.) According to the CBAs, such remittance reports, detailing the number of hours of Covered Work performed by employees, and corresponding benefit contributions are due "no later than the twentieth (20th) day of the month following the month in which they were incurred." (Saraceni Decl. ¶ 18; 2016-2020 BT CBA Art. 2 ¶ 19; 2020-2023 BT CBA Art. 2 ¶ 20; 2019-2022 MES CBA Art. XV.) Contributions are calculated by taking the number of hours of Covered Work performed during the reporting period and multiplying those hours by the applicable rates set forth in the CBAs.

## II.     Trust Agreements and Collection Policies for Delinquent Employees

Each of the individual funds in the Local 1 Funds is governed by a trust agreement (collectively, the "Local 1 Trust Agreements"), which, among other things, establish trust funds that, as relevant here, consist of "sums of money that have been or will be paid or which are due and owing to the Fund[s] by the Employers as required by Collective Bargaining Agreements." (Ex. F to Saraceni

Decl. ("Welfare Fund Trust Agreement") Art. II Sec. 2, Dkt. 43-6; *see also* Am. Compl. ¶ 13-15; Exs. G ("ASB Fund Trust Agreement"), H ("Vacation Fund Trust Agreement"), I ("Education Fund Trust Agreement") to Saraceni Decl. Art. II Sec 2, Dkts. 43-7, 43-8, 43-9; Ex. J to Saraceni Decl. ("401(k) Fund Trust Agreement") Art. II Sec. 4, Dkt. 43-10.)

Similarly, the individual funds in the National Funds are each governed by trust agreements (collectively, the "National Funds Trust Agreements," together with the Local 1 Trust Agreements, the "Trust Agreements") which, like the Local 1 Trust Agreements, establish trust funds that consist of "sums of money as have been or shall be paid . . . by the Employers as contributions required by Collective Bargaining Agreements."    (Declaration of Toni C. Inscoe ("Inscoe Decl."), Dkt. 44; Ex. CC to Inscoe Decl. ("UANPF Trust Agreement") Art. II Sec. 2, Dkt. 44-1; Ex. DD to Inscoe Decl. ("ITF Trust Agreement") Art. II Sec. 2, Dkt. 44-2.)

The Trust Agreements are incorporated by reference in the CBAs and are binding upon Tri-C. (BT CBAs Art. 23 ¶ 91; MES CBAs Art. XV.)  The Trust Agreements permit the Funds to establish procedures, policies, and rules to collect unpaid contributions to the Funds.  (Welfare Fund Trust Agreement Art. V Sec 4(x); ASB Fund Trust Agreement Art. V Sec 4(x); Vacation Fund Trust Agreement Art. V Sec 4(x); Education Fund Trust Agreement Art. V Sec 4(bb); UANPF Trust Agreement Art. V Sec. 4(aa); ITF Trust Agreement Art. V Sec. 5(dd).)

Pursuant to the Trust Agreements, the Local 1 Funds adopted a policy for the collection of delinquent fringe benefit employer contributions (pertaining to the Welfare, Vacation & Holiday, and Trade Education funds, the "Fringe Benefit Collection Policy") and a policy for collection of delinquent employee contributions and 401(k)/ASB-C deferrals (pertaining to the 401(k) Savings Plan and Additional Security Benefit Fund, the "401(k) Collection Policy," together with the Fringe Benefit Collection Policy, the "Local 1 Collection Policies").  (Am. Compl. ¶ 15; Ex. K to Saraceni Decl. (Fringe Benefit Collection Policy), Dkt. 43-11; Ex. L to Saraceni Decl. (401(k) Collection Policy),

Dkt. 43-12.)   Additionally, pursuant to the Trust Agreements, the National Funds promulgated delinquency procedures for the collection of contributions due to the UANPF and the ITF (collectively, the "National Collection Policies," together with the Local 1 Collection Policies, the "Collection Policies").  (Ex. EE to Inscoe Decl. ("UANPF Collection Policy"), Dkt. 44-3; Ex. FF to Inscoe Decl. ("ITF Collection Policy"), Dkt. 44-4.)

Under the 401(k) Collection Policy, 401(k)/ASB-C deferrals are due "seven (7) business days after the end of the payroll period from which [deferrals] were made and deducted from the wages of the employee."  (401(k) Collection Policy Art. III Sec. B ¶ 1.)

Under the Collection Policies, Tri-C is required to make its books and records available for the purpose of conducting an audit to confirm its compliance with its benefit obligations to the Funds. (Am. Compl. ¶ 20; Saraceni Decl. ¶ 21; Fringe Benefit Collection Policy Art. IV; 401(k) Collection Policy Art. V; Inscoe Decl. ¶¶ 9, 12; see UANPF Trust Agreement Art. VI, Sec. 4; ITF Trust Agreement Art. VI, Sec. 4.)  In the event an employer fails to submit remittance reports and payments, refuses to permit an audit, or refuses to allow the Funds' auditor access to pertinent records, the Funds may estimate the amount of the employer's delinquent payments by following the estimation protocols provided for in the Collection Policies.  (Am. Compl. ¶ 18; Saraceni Decl. ¶¶ 22-26; Fringe Benefit Collection Policy Art. IV ¶¶ 10-11; 401(k) Collection Policy Art. V. ¶¶ 10-11; Inscoe Decl. ¶ 13; see UANPF Trust Agreement Art. VI Sec. 6; ITF Trust Agreement Art. VI Sec. 7.)  After the Funds send the employer a letter by regular mail and by certified mail, return receipt requested, stating that the estimate will be made if the employer does not schedule an audit within seven (7) days after the date of the letter, the Funds may then file a lawsuit against the employer seeking the estimated amount of contributions if the employer does not fully cooperate.  (Saraceni Decl. ¶ 26; Fringe Benefit Collection Policy Art. IV ¶ 10.)

To the extent that Tri-C fails to pay contributions or deferrals, the Collection Policies set forth

additional liabilities. The Local 1 Collection Policies impose liquidated damages of 20% on the amount owing, interest rates of 10% per annum, and all reasonable audit and accounting expenses, attorneys' fees, disbursements, and court costs. (Am. Compl. ¶ 22; Fringe Benefit Collection Policy Art. II ¶ 6; 401(k) Collection Policy Art. III Sec. B ¶ 2.) The National Collection Policies impose liquidated damages of 10% and 20% of the principal amount due regarding the UANPF and ITF, respectively, interest rates of 12% per annum, and all reasonable audit and accounting expenses, attorneys' fees, disbursements, and court costs. (Am. Compl. ¶ 23; UANPF Collection Policy ¶ 9; ITF Collection Policy at 3, 4; *see* UANPF Trust Agreement Art. VI Secs. 4, 5; ITF Trust Agreement Art. VI Secs. 4, 6.)

Under the CBAs and the Fringe Benefit Collection Policy, the Funds may also assess an administrative fee of no less than $100.00 for each failure to pay monthly contributions or weekly deferrals. (2016-2020 BT CBA Art. II ¶¶ 16, 23, Art. V ¶ 27; 2020-2023 BT CBA Art. II ¶¶ 17, 24, Art. V ¶ 28; 2016-2019 MES CBA Art. VIII; 2019-2022 MES CBA Art VIII; Fringe Benefit Collection Policy Art. II ¶ 6.)

### III.    Tri-C's Delinquencies to the Local 1 Funds

In March 2022, the Local 1 Funds requested an audit of Tri-C covering the period July 1, 2019 through March 2022. (Saraceni Decl. ¶ 30.) After some correspondence between Tri-C and the Funds' auditor, including a letter mailed via both regular mail and certified mail warning that the Funds would estimate audit findings if Tri-C did not agree to allow an audit within seven days, Tri-C failed to comply with the Funds' request for an audit. (Saraceni Decl. ¶¶ 31-32; Ex. N to Saraceni Decl., Dkt. 43-14.)

Plaintiffs filed the Complaint on March 23, 2022 (Compl., Dkt. 1), followed by the Amended Complaint on March 24, 2022. (Am. Compl.)

Pursuant to the Collection Policies, the Funds prepared an estimated audit of Tri-C covering

6

the period July 1, 2019 through March 31, 2022 and determined that Tri-C owed contributions in the estimated principal amount of $1,720,440.65. (*See* Saraceni Decl. ¶¶ 35, 41; Ex. O to Saraceni Decl. ("2019-2022 Estimated Audit"), Dkt. 43-15.)

On August 30, 2022, Tri-C submitted reports detailing the amounts owed to the Local 1 Funds for March 2022, but did not remit full contributions for those amounts. (*See* Saraceni Decl. ¶ 42; Ex. Q to Saraceni Decl. ("Mar. 2022 Fringe Remittance Reports"), Dkt. 43-17.) Based on these reports, the Local 1 Funds determined that Tri-C owes contributions of $38,659.55 for March 2022.

Tri-C also submitted reports without payments, detailing 401(k)/ASB-C deferrals owed for March 2022. (*See* Ex. S to Saraceni Decl. ("Deferral Remittances Mar. 2022"), Dkt. 43-19.) Based on these reports, the Local 1 Funds determined that Tri-C failed to remit 401(k)/ASB-C deferrals totaling $2,337.11 for March 2022. (Saraceni Decl. ¶ 43.)

Contributions from Tri-C to the Local 1 Funds for October 2022 through August 2023 became due (Saraceni Decl. ¶ 44-49), but Tri-C did not submit remittance reports or contributions to the Local 1 Funds for this period. (Memorandum in Support ("Pl. Mem."), Dkt. 47 at 5-6; Saraceni Decl. ¶¶ 45-49.) The Local 1 Funds estimated the amounts owed for October 2022 – August 2023 by using Tri-C's remittance reports from January, February, and March 2022, concluding that Tri-C owes the Local 1 Funds contributions of $38,660.97 per month for a total of $425,270.67. (Saraceni Decl. ¶¶ 46-48; Ex. V to to Saraceni Decl. ("Mar. 2022, Oct. 2022 – Aug. 2023 Estimation"), Dkt. 43-22; Ex. U to Saraceni Decl. ("Fringe Remittances"), Dkt. 43-21.)

Tri-C did not timely submit remittance reports or deferrals to the 401(k) Savings Plan for the weeks of November 9, 2021, and February 8, 2022 through March 15, 2022, or to the ASB-C Fund for the weeks of February 8, 2022 through March 15, 2022. (Saraceni Decl. ¶¶ 62-63.) In addition, between the time the Amended Complaint was filed on March 24, 2022 and the Motion was filed on October 5, 2023, 401(k)/ASB-C deferrals from October 2022 through September 5, 2023 became

due.  (Saraceni Decl. ¶ 64.)  The Local 1 Funds estimate that Tri-C owes 401(k)/ASB-C deferrals totaling $79,954.55 for the weeks of November 9, 2021, March 15, 2022 – March 22, 2022, August 30, 2022, October 25, 2022 – November 1, 2022, and November 15, 2022 – September 5, 2023. (Saraceni Decl. ¶¶ 64-68.)

The Funds also contend that Tri-C owes them lost earnings of $223.97.  (Saraceni Decl. ¶ 76.) Pursuant to the Collection Policies, Tri-C is liable for lost earnings determined by application of the U.S. Department of Labor's Voluntary Fiduciary Correction Program Online Calculator ("DOL VFCP Online Calculator").  (401(k) Collection Policy Art. III Sec. B ¶ 2.)  According to reports provided by Plaintiffs, Tri-C owes the Local 1 Funds $223.97 due to the late payment of 401(k) Salary Deferrals for the period from November 14, 2021 through March 8, 2022.  (Saraceni Decl. ¶¶ 76, 80; Ex. T to Saraceni Decl., "401(k) Employer Status Letter," Dkt. 43-20.)

Additionally, Plaintiffs request $560.32 in "401(k)/ASB-C interest on file."  (Saraceni Decl. ¶ 76.)  Plaintiffs provided reports which they claim entitle them to this money.  (401(k) Employer Status Letter at 6-7.)

To date, the Funds have recovered $85,000 from Tri-C's surety, PIIC, pursuant to a settlement agreement.  (*See* Ex. Z to Saraceni Decl. ("PIIC Payment"), Dkt. 43-26.)  Plaintiffs agree to apply this amount as an offset to the total recovery from Tri-C.  (*See, e.g.*, Saraceni Decl. ¶ 86.)

**IV.    Tri-C's Delinquencies to the National Funds**

At the time the Amended Complaint was filed in March 2022, Tri-C had not submitted remittance reports or contributions to the National Funds for the months of October 2021, January 2022, and February 2022.  (Am. Compl. ¶ 30; Inscoe Decl. ¶ 15.)  Tri-C ultimately submitted remittance reports and partial contributions for October 2021, which the UANPF used to determine that Tri-C had a contribution shortage and still owed $843.33 for that month.  (Inscoe Decl. ¶ 18; Ex. GG to Inscoe Decl. ("Oct. Reports") at 2 (ECF pagination), Dkt. 44-5; Ex. HH to Inscoe Decl.

("Jan. 2022-Dec. 2022 Estimation") at 1 (ECF pagination), Dkt. 44-6.)

Remittance reports and contributions for March 2022 through August 2023 became due after the Amended Complaint was filed. (Inscoe Decl. ¶ 16.) Tri-C did not submit remittance reports or contributions for this period. (Inscoe Decl. ¶ 20.) The National Funds estimated that Tri-C owed contributions for this period totaling $140,570.00 to the UANPF and $4,395.00 to the ITF. (*Id.* ¶ 32.)

## PROCEDURAL BACKGROUND

After Tri-C failed to respond to the Amended Complaint, Plaintiffs requested a certificate of default (Dkt. 19), which the Clerk of Court entered on July 26, 2022. (Dkt. 22.)

Plaintiffs moved for default judgment against Tri-C on February 13, 2023. (Dkt. 27.) After the Court identified various errors in that motion (*see, e.g.*, Sept. 18, 2023 Order), Plaintiffs moved to withdraw, with permission to renew the motion to correct those errors. That request was granted (Sept. 21, 2023 Order), and Plaintiffs subsequently filed the Motion on October 5, 2023.

## DISCUSSION

### I.    Default Judgment Standard

Federal Rule of Civil Procedure 55 governs the procedure that applies in cases where there is a default during the course of litigation. *See* Fed. R. Civ. P. 55; *see also City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (2d Cir. 2011). It provides "a 'two-step process' for the entry of judgment against a party who fails to defend." *Mickalis Pawn Shop*, 645 F.3d at 128; *see also GuideOne Specialty Mut. Ins. Co. v. Rock Cmty. Church, Inc.*, 696 F. Supp. 2d 203, 208 (E.D.N.Y. 2010). First, when a defendant "has failed to plead or otherwise defend," the Clerk of Court enters the defendant's default. Fed. R. Civ. P. 55(a). Then, the plaintiff must "apply to the court for a default judgment." Fed. R. Civ. P. 55(b)(2).

A default "constitutes an admission of all well-pleaded factual allegations in the complaint and the allegations as they pertain to liability are deemed true." *United States v. Myers,* 236 F. Supp. 702,

9

706 (E.D.N.Y. 2017) (citations omitted). However, "just because a party is in default, the plaintiff is not entitled to a default judgment as a matter of right." *GuideOne Specialty Mut. Ins. Co.*, 696 F. Supp. 2d at 208. The Court must ensure that (1) jurisdictional requirements are satisfied, *see Mickalis*, 645 F.3d at 125-27; (2) the plaintiff took all the required procedural steps in moving for default judgment, Local Civ. R. 55.2(c); and (3) the plaintiff's allegations, when accepted as true, establish liability as a matter of law. *Finkel v. Romanowicz,* 577 F.3d 79, 84 (2d Cir. 2009). The Court exercises significant discretion in deciding whether to grant a default judgment, including whether the grounds for default are clearly established and the amount of damages. *See GuideOne Specialty Mut. Ins. Co.*, 696 F. Supp. 2d at 208; *see also Shah v. N.Y. State Dep't of Civil Serv.*, 168 F.3d 610, 615 (2d Cir. 1999); *Klideris v. Trattoria El Greco*, No. 10-CV-4288 (JBW)(CLP), 2011 WL 7114003, at *2 (E.D.N.Y. Sept. 23, 2011), *R&R adopted,* 2012 WL 273078 (E.D.N.Y. Jan. 30, 2012); *Mickalis*, 645 F.3d at 129.

## II.    Jurisdiction

The court from which default judgment is sought must confirm it has subject matter jurisdiction over the action. *See Mickalis*, 645 F.3d at 125-26; *see also Jennifer Matthew Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Human Servs.*, 607 F.3d 951, 955 (2d Cir. 2010). The Court may also inquire whether it has personal jurisdiction. *See Mickalis*, 645 F.3d at 133; *see Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Corp.*, 619 F.3d 207, 213 (2d Cir. 2010).

Here, subject matter jurisdiction exists pursuant to Section 301(a) of the LMRA, which states that "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." *See Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 403 (1988). This Court has personal jurisdiction over Tri-C because Tri-C is a New York corporation with its principal place of business within the Eastern District of New York. (Am. Compl. ¶ 8). *See Daimler*

*AG v. Bauman*, 571 U.S. 117, 137 (2014) ("With respect to a corporation, the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction.'") (alteration in original).

### III.    Service

The Summons and Complaint must be properly served on the defaulting party.  *See Advanced Capital Commercial Group, Inc. v. Suarez*, No. 09-CV-5558 (DRH)(GRB), 2013 WL 5329254, at *2 (E.D.N.Y. Sept. 20, 2013).  Plaintiffs have made a *prima facie* showing of proper service of the Amended Complaint on Tri-C by filing a process server's Affidavit of Service through the Secretary of State pursuant to § 306 of the New York Business Corporation Law.  (Dkt. 16.)  *See Old Republic Ins. Co. v. Fin. Servs. of America, Inc.*, 301 F.3d 54, 57 (2d Cir. 2002).

### IV.    Procedural Requirements

Plaintiffs have demonstrated that they have met the procedural requirements for filing a motion for default judgment pursuant to Fed. R. Civ. P. 55 and Local Rule 55.2, including taking the required procedural steps to provide proper notice to Tri-C.  Plaintiffs requested a Certificate of Default, which was entered by the Clerk of the Court, and notified Tri-C of the status of this action by mailing Tri-C the Motion papers.  (Dkt. 48.)

### V.    Liability

When determining liability, the Court accepts as true all well-pleaded allegations in the complaint, drawing all reasonable inferences in favor of Plaintiffs.  *See Au Bon Pain Corp v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981); *see also Finkel*, 577 F.3d at 84; *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992).  Plaintiffs seek a default judgment against Tri-C for unpaid benefit contributions and deferrals pursuant to ERISA, 29 U.S.C. § 1145, and violations of the CBAs as set forth in the LMRA, 29 U.S.C. § 185.

Section 515 of ERISA provides that "[e]very employer who is obligated to make contributions

to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. A "multiemployer plan" is a plan "to which more than one employer is required to contribute," and "which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer." 29 U.S.C. § 1002(37). An "employee benefit plan" as defined by ERISA is an "employee welfare benefit plan or an employee pension benefit plan," or a plan that is both an employee welfare benefit plan and an employee pension benefit plan. 29 U.S.C. § 1002(3). The LMRA authorizes "suits for violation of contracts between an employer and a labor organization representing employees." 29 U.S.C. § 185(a). A "labor organization" is any organization "in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C. § 152(5).

Here, the Trustees of the Local 1 Funds are employer and employee trustees of "multiemployer labor-management trusts funds" organized and operated in accordance with Section 302(c) of the LMRA, 29 U.S.C. § 186(c), and have "employee benefit plans" within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3). (Am. Compl. ¶ 4.) The National Funds are employer and employee trustees of a "multiemployer employee pension benefit plan" as those terms are defined in Sections 3(2) and 3(37) of ERISA, 29 U.S.C. §§ 1002(2) and (37). (*Id.* ¶ 6.) The Union is a labor organization within the meaning of Section 301 of the LMRA, 29 U.S.C. § 185. (*Id.* ¶ 5.) In addition, Tri-C is bound by the CBA, the Trust Agreements, and the Collection Policies. (*Id.* at ¶¶ 10-11, 15; BT CBAs Art. 23 ¶ 91; MES CBAs Art XV.)

The CBAs required Tri-C to submit remittance reports and make payments to the Local 1 Funds and National Funds. The Collection Policies also required Tri-C to respond to and comply

with audit requests from the Local 1 Funds and National Funds.  In March 2022, the Local 1 Funds requested an audit for the period from July 1, 2019 through the then-present date, including mailing a letter via both regular mail and certified mail warning that the Funds would estimate audit findings if Tri-C did not agree to allow an audit within seven days, which Tri-C failed to comply with.  (Am. Compl. ¶ 32; Saraceni Decl. ¶¶ 30-33.)  Tri-C also failed to submit remittance reports and contributions to the Local 1 Funds for the period from October 2022 through August 2023.  (Saraceni Decl. ¶ 45.)

Similarly, Tri-C failed to submit reports or pay 401(k) deferrals for the week of November 9, 2021 and failed to submit reports or pay 401(k) deferrals for at least the weeks of August 30, 2022, October 25, 2022 – November 1, 2022, and November 15, 2022 – September 5, 2023.  (Saraceni Decl. ¶¶ 62-68.)  Finally, Tri-C submitted a report without full payment to the UANPF for October 2021, and failed to submit remittance reports and pay contributions to the UANPF and ITF for the period from January 2022 through August 2023.  (Inscoe Decl. ¶¶ 14-20, 31.)  Thus, Tri-C violated the CBAs and the Collection Policies.

Accepting Plaintiffs' allegations as true, I find that Plaintiffs have adequately established Tri-C's liability for failing to submit remittance reports and make payments, as required by the CBAs and Collection Policies, pursuant to ERISA, 29 U.S.C. § 1145, and the LMRA, 29 U.S.C. § 185.

## VI.    Damages

Pursuant to Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2), Section 302 of the LMRA, 29 U.S.C. § 185, the CBAs, the Trust Agreements, and the Collections Policies, Plaintiffs seek a judgment against Tri-C for the principal amount of delinquent contributions and deferrals, interest, liquidated damages, and attorneys' fees and costs.  (Saraceni Decl. ¶ 86; Inscoe Decl. ¶ 32.)  Plaintiffs also seek post-judgment interest.  (Saraceni Decl. ¶ 86.)

Although a "party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages." *Greyhound Exhibitgroup*, 973 F.2d at 158.

13

On a motion for default judgment, Plaintiffs bear the burden of presenting proof of damages.  *See CIT Bank, N.A. v. Dambra,* No. 14-CV-3951 (SLT) (VMS), 2015 WL 7422348, at *5 (E.D.N.Y. Sept. 25, 2015), *R&R adopted,* 2015 WL 7430006 (E.D.N.Y. Nov. 20, 2015).  To reach a conclusion as to damages, the Court relies on documentary evidence and detailed affidavits.  *See Action S.A. v. Marc Rich & Co. Inc.,* 951 F.2d 504, 508 (2d Cir. 1991).  The amount of damages awarded, if any, must be ascertained "with reasonable certainty."  *Credit Lyonnais Sec. (USA), Inc. v. Alcantara,* 183 F.3d 151, 155 (2d Cir. 1999).

### A.  *Fringe Benefit Employer Contributions Audit Estimation*

Because Tri-C failed to comply with Plaintiffs' requested payroll audit with respect to fringe benefit employer contributions for the period of July 2019 to March 2022, Plaintiffs were entitled under the terms of the Fringe Benefit Collection Policy to estimate Tri-C's monthly contribution obligations using the highest number of hours reported in any month during the audit period, less any hours Tri-C actually reported.  (Fringe Benefit Collection Policy Art. IV ¶ 10.)  Based on the hours Tri-C had reported for July 2019 through March 2022, Plaintiffs determined that the highest number of hours worked in any month was 1,119 hours under the BT CBAs, 1,542 hours under the MES CBAs for Journeymen and 1,444.5 hours for Helpers.  (*See* Saraceni Decl. ¶ 37; Ex. P to Saraceni Decl. ("Estimated Hours Calculation"), Dkt. 43-16.)  Using these numbers, Plaintiffs credited Tri-C for hours it reported each month and then multiplied the remaining hours by the applicable benefit rates set out in the CBAs to determine the estimated contributions owed for each month.  (2019-2022 Estimated Audit at 1-2 (ECF pagination); *see* 2016-2020 BT CBA Art. II; 2020-2023 BT CBA Art. II; 2016-2019 MES CBA Art. III, IV; 2019-2022 MES CBA Art. III, IV.)  I have reviewed Plaintiff's calculations and find that the monthly numbers are correct, resulting in yearly benefit contributions due of $420,643.90 in 2019, $742,606.42 in 2020, $457,706.85 in 2021, and $99,483.47 in 2022. (2019-2022 Estimated Audit at 3.)  The sum of the benefits due for all four years is $1,720,440.64.

Accordingly, I respectfully recommend that Plaintiffs be awarded $1,720,440.64 in estimated contributions from their 2019-2022 Estimated Audit.

Pursuant to the Fringe Benefit Collection Policy, Tri-C is liable to Plaintiffs for interest on the estimated contributions at the rate of ten percent per annum. (Fringe Benefit Collection Policy Art. II ¶ 6.) Monthly benefit contributions for each month are due on the 20th of the following month and interest is calculated starting the day after contributions were due. (*See* Fringe Benefit Collection Policy Art II ¶¶ 1, 6.)

The Collection Policies provide that interest is compounded annually. (*See, e.g.*, Saraceni Decl. ¶ 71; Fringe Benefit Collection Policy Art. II ¶ 6.) Plaintiffs have submitted calculations applying simple interest only. (*See* 2019-2022 Estimated Audit; Jan. 2022-Dec. 2022 Estimation.) Accordingly, I also calculate using simple, rather than compound interest.

Plaintiffs calculated interest on unpaid contributions up to October 5, 2023, stating that they are owed $534,605.30. (*See* Saraceni Decl. ¶¶ 71 n.5, 74; 2019-2022 Estimated Audit at 3.)

Plaintiffs' calculations are incorrect in two regards. First, the amount that Plaintiffs state is the "Estimated Interest" for each year improperly includes $200.00 every month for what Plaintiffs describe as "AF," an apparent reference to the administrative fee which Plaintiffs are entitled to under the CBAs and the Fringe Benefit Collection Policy, but which they separately requested and which I address *infra*. (*See* 2019-2020 Estimated Audit at 4-12.) This is clear because wherever Plaintiffs have indicated a total of the monthly amounts due for the year, they have described the amount as "TOTAL IC/AF DUE," combining both the interest and administrative fee. (*See id.* at 5, 8, 11, 12.) After removing these administrative fees from the monthly amounts due, the interest Plaintiff is entitled to decreases by $6,600.00.

Second, from June 2021 through December 2021, Plaintiffs incorrectly list the due dates for *every* month as June 20, 2021. The correct due date for each of these months is the twentieth day of

the month that immediately follows, *e.g.,* the due date for July 2021 is August 20, 2021, with applicable interest accruing as of August 21, 2021. (Fringe Benefit Collection Policy Art. II ¶ 1.) By using the incorrect start dates for these seven months, Plaintiffs overestimated interest by $8,787.29.[2]

Plaintiffs' interest calculations are otherwise correctly calculated. Plaintiffs are, therefore, owed $519,218.01 in estimated interest, which represents Plaintiffs' requested amount without the erroneously added $6,600.00 in administrative fees or the incorrectly calculated additional amount of $8,787.29 for 2021.

The Fringe Benefit Collection Policy also imposes liquidated damages of 20% on the principal balance owed. (Fringe Benefit Collection Policy Art. II ¶ 6.) The liquidated damages requested correctly constitute 20% of the estimated contributions. Thus, Tri-C owes Plaintiffs $344,088.12 in liquidated damages for the period of July 2019 to March 2022.

Accordingly, I respectfully recommend that Plaintiffs be awarded the following amounts with respect to the 2019-2022 Estimated Audit:

| Year | Estimated Contributions | Estimated Interest | Estimated Liquidated Damages | Total |
|---|---|---|---|---|
| 2019 | $420,643.90 | $164,946.05 | $84,128.78 | $669,718.73 |
| 2020 | $742,606.42 | $238,606.64 | $148,521.28 | $1,129,734.34 |
| 2021 | $457,706.85 | $100,278.11 | $91,541.37 | $649,526.33 |
| 2022 | $99,483.47 | $15,387.21 | $19,896.69 | $134,767.37 |
| Total | **$1,720,440.64** | **$519,218.01** | **$344,088.12** | **$2,583,746.77** |

---

[2] Plaintiffs overestimated the amount of interest due for June 2021 by $161.08; for July 2021 by $625.43; for August 2021 by $1,195.54; for September 2021 by $1,281.80; for October 2021 by $1,552.14; for November 2021 by $1,718.68; and for December 2021 by $2,252.62.

### B.  Actual Contributions for March 2022

Pursuant to the Fringe Benefit Collection Policy, Plaintiffs seek "actual contributions" for the hours in the March 2022 reports for which Tri-C failed to make payments.  (Saraceni Decl. ¶ 42.) Based on its own reported hours for March 2022, Tri-C owes $16,307.43 to Plaintiffs for 412 hours worked under the BT CBAs as well $22,352.12 for 1,560 hours worked under the MES CBAs, a total of $38,659.55.  (Saraceni Decl. ¶ 42; Mar. 2022 Fringe Remittance Reports at 1-8 (ECF pagination).)  Plaintiffs explain that they omitted these actual contributions from the fringe benefit estimation calculation addressed *supra*, (Saraceni Decl. ¶ 50-61); indeed, Plaintiffs subtracted 412 hours from the BT CBAs estimation for March 2022 and subtracted 1110.5 hours for journeymen and 1444.5 hours for helpers from the MES CBAs estimation for March 2022.  (*See* Estimated Hours Calculation; Ex. W. to Saraceni Decl., "March 2022 Audit Excerpt," Dkt. 43-23.)  As a result, there is no issue of double recovery.

Plaintiffs seek interest on the unpaid contributions for March 2022, at a rate of 10% per year from April 21, 2022 until October 2, 2023,[3] for a total of $5,613.58.  (Saraceni Decl. ¶ 72; Mar. 2022, Oct. 2022 – Aug. 2023 Estimation.)  Plaintiffs also seek liquidated damages in the amount of 20% of the unpaid contributions, which comes to $7,731.91.  (*Id.*)  Plaintiffs' calculations are correct and I, accordingly, respectfully recommend that Plaintiffs be awarded $5,613.58 in interest and $7,731.91 in liquidated damages for March 2022.

### C.  Estimated Contributions for October 2022 – August 2023

Plaintiffs seek $425,270.67 in estimated contributions for October 2022 through August 2023, for which Tri-C has failed to submit remittance reports or contributions.  (Saraceni Decl. ¶¶ 45, 49.) Federal Rule of Civil Procedure 54(c) generally limits recovery in a default judgment to what is

---

[3] Plaintiffs do not explain why they calculate interest here using a due date of October 2, 2023, rather than October 5, 2023 as they do elsewhere in the Motion.

demanded in the pleadings.  In an ERISA action, however, "a district court has discretion to award ERISA damages that accrue during the pendency of an action." *Ames v. STAT Fire Suppression*, Inc., 227 F.R.D. 361, 362 (E.D.N.Y. 2005).  A court may award "damages that accrued during the pendency of the litigation if the complaint put defendant on notice that plaintiff might seek such damages." *Finkel v. Triple A Grp., Inc.*, 708 F. Supp. 2d 277, 282 (E.D.N.Y. 2010) (awarding unpaid contributions that became due after the suit was filed because "the complaint includes a request for unpaid contributions that might become due and owing during the litigation").

In the Amended Complaint, Plaintiffs not only sought unpaid contributions then due and owing, but also sought "any additional benefit contributions, interest, liquidated damages, and attorneys' fees which become due and owing according to the CBA during the pendency of this action and that are unpaid as of the date judgment is entered." (Am. Compl. ¶ 42.)  Accordingly, the Court may award unpaid contributions for months in which remittance reports and contributions were not submitted for October 2022 through August 2023.

Plaintiffs estimated contributions due for October 2022 through August 2023 by taking the average of the contributions of the last three months for which Tri-C submitted remittance reports, January, February, and March of 2022, and multiplying that average by the number of delinquent months.  (Saraceni Decl. ¶¶ 44-49.)  Under the Fringe Benefit Collection Policy, Plaintiffs must estimate contributions using "the average of the monthly payments based on reports actually submitted by the employer for the last three (3) months for which payments and reports were submitted."  (Fringe Benefit Collection Policy Art. IV ¶ 9); *see* Saraceni Decl. ¶ 46 (noting that the funds estimated contributions "[p]ursuant to the Collection Policy.")  Plaintiffs note that they are "aware" of the "exact number of hours of Covered Work performed for which contributions are due" for March 2022 (Saraceni Decl. ¶ 48 n.3), and indeed, as discussed *supra* in Section VI(B), that

information was provided.  Therefore, I find that the method of estimation used by Plaintiffs is acceptable under the Fringe Benefit Collection Policy.

Plaintiffs correctly calculated the average monthly payment based on the period from January – March 2022 to be $38,660.97; this number times the eleven months from October 2022 through August 2023 equals $425,270.67, the amount requested by Plaintiffs.  Accordingly, Plaintiffs are entitled to $425,270.67 in estimated contributions for October 2022 through August 2023.

Plaintiffs also seek $19,171.60 in interest for each monthly payment due for the period October 2022 – August 2023 at the rate of 10% per annum through October 2, 2023, and 20% of the estimated contributions in liquidated damages in the amount of $85,054.13.   (Mar. 2022, Oct. 2022 - Aug. 2023 Estimation.)  I find that Plaintiffs' calculations are correct and, accordingly, respectfully recommend that Plaintiffs be awarded $19,171.60 in interest and $85,054.13 in liquidated damages for October 2022 through August 2023.

### D.  401(k)/ASB-C Deferrals for March 2022

Plaintiffs request 401(k)/ASB-C deferral deficiencies for March 2022, specifically for the weeks of March 15 and March 22, 2022, totaling $2,337.11.  (Saraceni Decl. ¶¶ 43, 67.)  Plaintiffs assert that they were owed a total of $6,113.00 in 401(k)/ASB-C deferrals during the period of March 2022 and state that $3,775.89 of this amount was paid, while the balance of $2,337.11 remains unpaid. (Saraceni Decl. ¶ 67.)

It is unclear how Plaintiffs arrived at these numbers.  In support of their request for $2,337.11, Plaintiffs cite to and rely on various reports provided for the weeks of March 15 and March 22, 2022.[4] (*See* Ex. S to Saraceni Decl., "Tri-C Deferral Remittances Mar. 2022," Dkt. 43-19.)  The reports are

---

[4] Plaintiffs also cite an employer status letter to Defendants in support of this amount; however, that letter simply lays out all deficiencies and other costs and fees allegedly due to Plaintiffs at the time the letter was sent without providing supporting documentation.  (Saraceni Decl. ¶ 43; 401(k) Employer Status Letter, Dkt. 43-20.)

not clearly stated, and Plaintiffs do not explain their contents. For example, some of them appear to contain duplicative or overlapping information. The amounts referred to in the reports, including a 401(k) total for March 22, 2022 of $482.24 (*id.* at 4), an ASB-C total for March 22, 2022 of $391.82 (*id.* at 5), a 401(k) total for March 15, 2022 of $851.74 (*id.* at 8), another 401(k) total for March 15, 2022 of $482.24 (*id.* at 11), and an ASB-C total for March 15, 2022 of $391.82 (*id.* at 12) add up to a total of $2,599.86 for the weeks of March 15 and March 22, 2022. Plaintiffs also submitted a report indicating that a 401(k) total of $964.55 applicable to March 22, 2022 was paid (*id.* at 1), but it is unclear if this amount was applied to the $2,599.86 total based on the amounts due in the other reports. If so, there would be a deficiency of $1,635.31, not $2,337.11.

I have applied several other methods of adding and subtracting the totals provided by Plaintiffs in an effort to reach Plaintiffs' requested amount, but to no avail. Plaintiffs have not provided support for or properly explained their request for $2,337.11 in deferral deficiencies for March 2022. The Court has already given Plaintiffs ample opportunity to do so, including specifically highlighting several issues with Plaintiffs' request for 401(k)/ASB-C deferrals and issues with clarity in Plaintiffs' previous motion for default with regard to payments for March 2022. (*See, e.g.*, Sept. 18, 2023 Order.) Based on the information provided, I cannot ascertain "with reasonable certainty" what damages should be awarded for the deferral deficiencies. *Credit Lyonnais Sec. (USA), Inc. v. Alcantara,* 183 F.3d at 155. Accordingly, I respectfully recommend that Plaintiffs receive no award for deferral deficiencies for March 2022.

Relatedly, regarding their request for estimated 401(k)/ASB-C deferrals for March 2022, Plaintiffs have not sufficiently established that their request avoids double recovery between estimated fees and fees that were actually paid. Plaintiffs acknowledge that Defendants paid a portion of the fees due for March 2022 and seek the unpaid deficiency, yet they also request a total of $1,463.05 in estimated unpaid deferrals for the week of March 15, 2022 and a total of $514.06 in estimated unpaid

deferrals for the week of March 22, 2022. (401(k) Estimate, Dkt. 43-25.) While Plaintiffs correctly attempt to credit already paid deferrals, they do not explain how they arrived at the reduced estimates they request, and the 401(k)/ASB-C reports Plaintiffs provide for those weeks shed no light on the matter. (*See* Tri-C Deferral Remittances Mar. 2022, Dkt. 43-19.) As with Plaintiffs' request for deferral deficiencies for March 2022, I have exhaustively attempted to determine the source of the estimated amounts requested by Plaintiffs for these weeks by reviewing the reports and estimates provided by Plaintiffs, but with no success. Accordingly, I cannot ascertain with reasonable certainty that the estimated deferrals requested for March 2022 by Plaintiffs are justified and, therefore, respectfully recommend that Plaintiffs' request for estimated 401(k)/ASB-C deferrals for March 2022 be denied.

### E.  *Estimated 401(k)/ASB-C Deferrals*

Plaintiffs seek estimated 401(k)/ASB-C deferrals for the weeks of November 9, 2021, August 30, 2022, October 25, 2022 – November 1, 2022, and November 15, 2022 – September 5, 2023 (the "401(k)/ASB-C Estimated Weeks").[5]  (Pl. Mem. at 5, 18; Saraceni Decl. ¶¶ 43, 62-68, 86(c).) According to Plaintiffs' calculations, Tri-C owes estimated 401(k)/ASB-C deferrals for these weeks totaling $77,977.44.[6]

As with similar estimations under the Fringe Benefit Collection Policy, under the 401(k) Collection Policy, where an employer is two or more months delinquent in making its payments and has not submitted remittance reports, Plaintiffs must estimate the delinquency with reference to "the average of the monthly payments based on reports actually submitted by the employer for the last

---

[5] Although Plaintiffs state that Tri-C failed to submit reports to the 401(k) savings plan or ASB-C fund for the period from February 8, 2022 – March 15, 2022, (Saraceni Decl. ¶¶ 62-23), Plaintiffs do not appear to be seeking deferrals for this period. (*Id.* at ¶ 65.) Furthermore, reports *were* submitted for those periods as well as for the period from March 15, 2022 – March 22, 2022, just not timely. (*See* Tri-C Deferral Remittances Jan.-Mar. 2022 at 36-84.)

[6] March 2022 deferrals are dealt with separately above. Plaintiffs may seek estimated deferrals that post-date the Amended Complaint for the same reason they could seek estimated contributions that post-date the Amended Complaint. *Supra* Section VI.C.

three (3) months for which payments and reports were submitted." (401(k) Collection Policy Art. V ¶ 9); *see* Saraceni Decl. ¶ 68 (noting that the funds estimated 401(k)/ASB-C deferrals "[p]ursuant to the 401(k) Collection Policy").) Here, Plaintiffs calculated the weekly estimates based on reports submitted for January, February, and March 2022.[7] (Saraceni Decl. ¶ 66; Tri-C Deferral Remittances Jan.-Mar. 2022.) Plaintiffs have acknowledged they received either full or partial payment from Tri-C for each of these months and have provided reports from Tri-C for each of the months. (Saraceni Decl. ¶ 67.)

Pursuant to the 401(k) Collection Policy, the estimated weekly amount for January – March 2022, $1,624.53, is multiplied by the number of weeks of delinquency to arrive at the total amount of estimated deferrals. There are forty-seven 401(k)/ASB-C Estimated Weeks. This amount multiplied by $1,624.53 is $76,352.91. I note that Plaintiffs' calculation is incorrect because they included a duplicate request for the week of May 30, 2023 in their calculations. (401(k) Estimate.) Accordingly, Plaintiffs are entitled to $76,352.91 in estimated 401(k)/ASB-C deferrals for the 401(k)/ASB-C Estimated Weeks.

Plaintiffs seek interest for the 401(k)/ASB-C Estimated Weeks at 10% per annum and liquidated damages at 20% of the delinquency amount. (Saraceni Decl. ¶ 73; 401(k) Estimate.) Using the correct 401(k)/ASB-C deferrals due, the correct interest due to Plaintiffs is $3,991.00, *i.e.,* the total number of days between each of the individual forty-seven due dates and October 5, 2023 (8,967 days in all), times 10% divided by 365 days, then multiplied by the result of the 401(k) Collection Policy estimation ($1,624.53). (*See, e.g.*, Saraceni Decl. ¶ 74.) The liquidated damages due to Plaintiffs total $15,270.58, or 20% of the $76,352.91 delinquency. Accordingly, I respectfully recommend that Plaintiffs be awarded a total of $19,261.58 in interest and liquidated damages for the 401(k)/ASB-C Estimated Weeks.

---

[7] See fn.5, *supra.*

### F.  Miscellaneous Amounts

According to the 401(k) Collection Policy, lost earnings are calculated using the DOL VFCP Online Calculator.  (401(k) Collection Policy Art. III Sec. B.)  The Funds have assessed that Tri-C owes lost earnings of $223.97 due to the late payment of 401(k) Salary Deferrals for the period from November 14, 2021 through March 8, 2022.  (Saraceni Decl. ¶¶ 76, 80; Ex. T to Saraceni Decl., "401(k) Employer Status Letter," Dkt. 43-20 at 4-5.)

Plaintiffs also request "401(k)/ASB-C interest on file." (Saraceni Decl. ¶¶ 76, 86(e).)  Plaintiffs state that "interest on file" differs from the 401(k)/ASB-C interest on deferrals already addressed *supra* because it is interest that has already been fully assessed on deferrals that have been paid in full, but that were paid late.  (Saraceni Decl. ¶¶ 80-81.)  Plaintiffs explain that this interest is on deferrals that Tri-C failed to timely pay for the weeks of "November 14, 2021 through March 8, 2022."  (*Id.*)  Due to these late payments, the Funds have assessed that Tri-C owes 401(k)/ASB-C interest on file of $560.32.  (401(k) Employer Status Letter at 6-7.)

Based on the numbers provided, Plaintiffs' calculations are correct, except that Plaintiffs include amounts predating November 14, 2021:[8] $0.91 in 401(k)/ASB-C interest on file and $0.27 in lost earnings.  (401(k) Employer Status Letter at 4-7.)  Therefore, I respectfully recommend that the Court grant Plaintiffs' request for $223.70 in lost earnings and $559.41 in 401(k)/ASB-C interest on file.

Under the Fringe Benefit Collection Policy, Plaintiffs may assess an administrative fee of $100.00 for each instance in which Tri-C failed to pay contributions.  (Saraceni Decl. ¶¶ 82-83; Fringe Benefit Collection Policy II ¶ 6.)  Plaintiffs contend that they are entitled to $8,800.00 in administrative fees for Tri-C's failure to pay contributions for 44 months under two separate CBAs

---

[8] Plaintiffs only request lost earnings and interest on file from November 14, 2021 through March 8, 2022. (Saraceni Decl. ¶¶ 79-80.)

pursuant to the following equation: "(44 months delinquent x $100) x 2 contracts." (Saraceni Decl. ¶¶ 82-83, 86(d).) Plaintiffs have identified the 44 months in which Tri-C failed to pay contributions as July 2019 through March 2022 (33 months) and October 2022 through August 2023 (11 months). Plaintiffs' charts support this, and their calculations are correct. (*See* 2019-2022 Estimated Audit (ECF pagination); Mar. 2022, Oct. 2022 – Aug. 2023 Estimation.) Accordingly, I respectfully recommend that Plaintiffs be awarded $8,800.00 in administrative fees based on the 44 months in which Tri-C failed to pay contributions under the two CBAs ((44 months x $100) x 2 CBAs).

### G. National Funds

Plaintiffs seek actual contributions to the UANPF for the month of October 2021 and estimated contributions to both the UANPF and the ITF for the period January 2022 through August 2023. (Inscoe Decl. ¶ 32.) Tri-C submitted a remittance report and some contribution for October 2021, but not the full amount, leaving a shortfall of $834.33. It, thus, owes Plaintiffs that amount. (Inscoe Decl. ¶ 18; Oct. Reports at 2 (ECF pagination); Jan. 2022-Dec. 2022 Estimation at 1 (ECF pagination).) In addition, Plaintiffs request liquidated damages of $83.43 and $188.32 in interest on this shortfall through February 7, 2023.[9] (*See* Inscoe Decl. ¶ 19; Jan. 2022-Dec. 2022 Estimation at 1 (ECF pagination).) These amounts are properly calculated, and Plaintiffs are entitled to them.

Tri-C also owes Plaintiffs estimated delinquent contributions for January 2022 through August 2023 as to both the UANPF and the ITF. As permitted by the National Funds Trust Agreements, Plaintiffs calculated these estimates by taking the average monthly payments of the "last three (3) months for which payments or reports were submitted." (Inscoe Decl. ¶¶ 13, 22-23; UANPF Trust Agreement Art VI Sec. 6; ITF Trust Agreement Art. VI Sec. 7.) For the UANPF, Tri-C submitted remittance reports and paid contributions of $8,001.48 in October 2021, $6,709.41 in November 2021,

---

[9] Plaintiffs do not explain why they request interest only up to February 7, 2023.

and \$6,374.50 in December 2021, resulting in an average of \$7,028.46.[10]  (Inscoe Decl. ¶¶ 22-23; Jan. 2022-Dec. 2022 Estimation at 1 (ECF pagination); Ex. II to Inscoe Decl. ("Oct.-Dec. 2021 Payments"), Dkt. 44-7.)  For the ITF, Tri-C submitted remittance reports and paid contributions of \$254.25 in October 2021, \$215.30 in November 2021, and \$189.70 in December 2021 for an average of \$219.75.  (Inscoe Decl. ¶¶ 26-27 n.4; Jan. 2022-Dec. 2022 Estimation at 2 (ECF pagination); Oct.-Dec. 2021 Payments.)  Plaintiffs then multiplied these monthly averages by twenty, the number of months for which Tri-C owes delinquent contributions, resulting in Tri-C owing \$140,569.20 to the UANPF and \$4,395.00 to the ITF in estimated contributions for the period January 2022 through August 2023.  (Inscoe Decl. ¶¶ 24, 28; Jan. 2022-Dec. 2022 Estimation.)

Plaintiffs seek interest on the estimated and actual contributions to the UANPF and ITF at an annual rate of twelve percent.  (ITF Trust Agreement at 25; UANPF Collection Policy ¶ 9, Dkt. 44-3.)  Plaintiffs request interest for the period January 2022 through August 2023 on unpaid contributions up to October 5, 2023, stating that they are owed \$14,125.18 in interest on contributions to the UANPF and \$441.63 in interest on contributions to the ITF.  (Inscoe Decl. ¶ 29-30; Jan. 2022-Dec. 2022 Estimation.)  Plaintiffs fail to provide proper calculations for this period, instead citing calculations for only January 2022 through December 2022, which are calculated with reference to a "current date" of February 7, 2023, not October 5, 2023.  (Jan. 2022-Dec. 2022 Estimation.)  Furthermore, Plaintiffs incorrectly state that there are 684 days between February 20, 2022 (the due date for the January 2022 contributions) and October 5, 2023 when there are only 592 days between those dates.  (*See* Inscoe Decl. ¶ 30.)  Using the correct number of days between the delinquency dates for each month and October 5, 2023 results in total interest of \$14,072.32 on contributions to the

---

[10] The numbers Plaintiffs cite are inconsistent with the \$7,028.50 average they reference.  (*See* Inscoe Decl. ¶¶ 22 (stating amounts of \$8,001.48 for October 2021, \$6,09.41 [sic] for November 2021, and \$6,374.50 for December 2021).)  Assuming that Plaintiffs meant to refer to November 2021 contributions of \$6,709.41, this leads to an average of \$7,028.46.

UANPF and $439.98 on contributions to the ITF.  Tri-C is therefore liable to Plaintiffs for interest in those amounts.

Tri-C is also liable to Plaintiffs for liquidated damages on delinquent contributions under the National Funds Trust Agreements and National Collection Policies.  (Inscoe Decl. ¶ 31; ITF Trust Agreement at 25; UANPF Collection Policy ¶ 9.)  Applicable liquidated damages are calculated at the rate of 10% of the UANPF delinquent contributions and 20% of the ITF delinquent contributions. (*Id.*)  Accordingly, Tri-C owes $14,056.92 in liquidated damages to the UANPF and $879.00 in liquidated damages to the ITF for January 2022 through August 2023.

### H. Pre-Judgment Interest

Plaintiffs seek additional interest on the estimated contribution delinquencies at a rate of 10% per annum for the Local 1 delinquencies and a rate of 12% per annum for the UANPF and ITF delinquencies from October 6, 2023 through the date of the judgment.  (Pl. Mem. at 26-27 (ECF pagination); Saraceni Decl. ¶ 86(g).)  Although Plaintiffs do not explain the basis for this request, these are the rates of interest that would be due for unpaid delinquencies under the Collection Policies, as discussed *supra*.

Because the requested rates stem from the Collection Policies and continue to accrue until the delinquent amounts are paid, I respectfully recommend that Plaintiffs be awarded pre-judgment interest from October 6, 2023 through the date of judgment on the actual and unpaid contribution delinquencies and deferral deficiencies (not including interest and liquidated damages that have already accrued thereon) at a daily rate of $619.38 as to the Local 1 Funds, $46.49 as to the UANPF, and $1.44 as to the ITF.  *Cf., e.g., Frommert v. Becker*, 216 F. Supp. 3d 309, 315 (W.D.N.Y. 2016) (cleaned up), *clarified on reconsideration sub nom. Frommert v. Conkright*, No. 00-CV-6311, 2017 WL 3867795 (W.D.N.Y. May 4, 2017), *aff'd sub nom. Frommert v. Conkright*, 913 F.3d 101 (2d Cir. 2019) ("The Court of Appeals

26

has ruled that the rate used to calculate prejudgment interest is a matter 'confided to the district court's broad discretion. . . .'").

### I.   Post-Judgment Interest

"Interest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961.  Post-judgment interest is governed by the federal rate as set forth in 28 U.S.C. § 1961.  *See Tacuri v. Nithun Constr. Co.*, No. 14-CV-2908 (CBA)(RER), 2015 WL 790060, at *12 (E.D.N.Y. Feb. 24, 2015).  I respectfully recommend that Plaintiffs be awarded post-judgment interest, to be calculated from the date the Clerk of Court enters judgment in this action until the date of payment, at the rate set forth in 28 U.S.C. § 1961.

### J.   Attorney's Fees and Costs

Plaintiffs seek to recover $24,565.07 in attorneys' fees and $844.57 in costs.  (Am. Compl. ¶ 42; Grancio Decl. ¶¶ 20-21.)  Attorneys' fees and costs are mandatory under ERISA.  See 29 U.S.C. § 1132(g)(2)(D); see also *Mason Tenders Dist. Council Welfare Fund v. LJC Dismantling Corp.*, 400 F. Supp. 3d 7, 23 (S.D.N.Y. 2019).  The CBAs, Trust Agreements, and Collection Policies also provide for Plaintiffs' recovery of attorneys' fees and costs.  (2016-2020 BT CBA Art. II ¶ 23; 2020-2023 BT CBA Art. II ¶ 24; 2016-2019 MES CBA Art. VI; 2019-2022 MES CBA Art VI; Fringe Benefit Collection Policy Art. I ¶ 6; 401(k) Collection Policy Art. I ¶ 4; UANPF Trust Agreement Art VI Sec. 5; ITF Trust Agreement Art. VI Sec. 6.)

#### 1.   Attorneys' Fees

Attorneys' fees awarded by the Court must be "reasonable."  *See Riley v. City of New York*, No. 10-CV-2513 (MKB), 2015 WL 9592518, at *1 (E.D.N.Y. Dec. 31, 2015).  "[T]he lodestar – the product of a reasonable hourly rate and the reasonable number of hours required by the case – creates a presumptively reasonable fee."  *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011); *see also Scharff v. Cty. of Nassau*, No. 10-CV-4208 (DRH)(GRB), 2016 WL 3166848, at *3 (E.D.N.Y. May 20,

2016), *R&R adopted*, 2016 WL 3172798 (E.D.N.Y. June 6, 2016); *Riley*, 2015 WL 9592518, at *1. "District courts have broad discretion to determine both the reasonable number of compensable hours and the reasonable hourly rate." *Brady v. Wal- Mart Stores, Inc.*, 455 F. Supp. 2d 157, 203 (E.D.N.Y. 2006). The party applying for fees must support the hourly rates it claims with, for example, evidence of counsel's expertise and prevailing market rates. *See Riley*, 2015 WL 9592518, at *2.

### a. Hourly Rate

To determine a reasonable hourly rate, the Court considers "rates prevailing in the community for similar services of lawyers of reasonably comparable skill, experience, and reputation." *Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1159 (2d Cir. 1994) (internal quotations omitted). The "community" is the district in which the reviewing court sits. *Scharff*, 2016 WL 3166848, at *4. "The reasonable hourly rate is the rate a paying client would be willing to pay . . . bear[ing] in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 522 F.3d 182, 190 (2d Cir. 2008). The Court must also "bear in mind *all* of the case-specific variables that [the Second Circuit] and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate." *Id.* at 190 (emphasis in original). Those factors include the attorney's experience and expertise. *See Brady*, 455 F. Supp. 2d at 204; *Chen v. Cty. of Suffolk*, 927 F. Supp. 2d 58, 71 (E.D.N.Y. 2013). The fee applicant has the burden of justifying the requested rate as reasonable. *See Scharff*, 2016 WL 3166848, at *4.

In recent years, fees in ERISA cases have been awarded in the Eastern District of New York at an hourly rate of $300.00 to $450.00 for partners, $200.00 to $325.00 for senior associates, $100.00 to $200.00 for junior associates, and up to $90.00 for non-attorney support staff. *See Noboa v. Quality Homes USA, Inc.*, No. 21-CV-7134 (JMA)(LGD), 2023 WL 35030, at *2 (E.D.N.Y. Jan. 4, 2023) (citation and quotation marks omitted); *see also Perrone v. Amato*, No. 09-CV-316 (SIL), 2022 WL

595187, at *3 (E.D.N.Y. Feb. 27, 2022) (prevailing hourly rates "generally range from $300.00 to $450.00 for partner-level attorneys, and $200.00 to $325.00 for those with less experience"); *N.Y.C. Dist. Council of Carpenters v. Trs. of N.Y.C. Dist. Council of Carpenters Welfare Fund*, No. 16-CV-3429 (ARR)(ST), 2018 WL 3768586, at *3-4 (E.D.N.Y. July 23, 2018).

Plaintiffs were represented in this action by attorneys John Harras ("Harras"), Adrianna R. Grancio ("Grancio"), and Maura Moosnick ("Moosnick"). ("Grancio Decl.," Dkt. 46 ¶¶ 15-17.) Harras was a partner at the law firm Virginia & Ambinder, LLP ("V&A"); Grancio and Moosnick were associates at V&A when this case commenced, though Grancio has now become a partner. (*Id.*; Dkt. 31 at ¶ 12.) Harras is a 2015 graduate of St. John's University School of Law, Grancio is a 2016 graduate of St. John's University Law School, and Moosnick is a 2021 graduate of Fordham University School of Law. (*Id.*)

Harras billed his time at a rate of $375.00 per hour to the National Funds prior to April 1, 2022 and to the Local 1 Funds prior to June 1, 2022, and at a rate of $410.00 per hour to the National Funds after April 1, 2022 and to the Local 1 Funds after June 1, 2022. (Grancio Decl. ¶ 16.) This is within the range of rates recognized as reasonable in the Eastern District of New York for a partner.

Grancio billed her time at a rate of $285.00 per hour prior to April 1, 2022 to the National Funds and prior to June 1, 2022 to the Local 1 Funds, and at a rate of $310.00 per hour after April 1, 2022 to the National Funds and after June 1, 2022 to the Local 1 Funds. (Grancio Decl. ¶ 15.) This is within the range of rates recognized as reasonable in the Eastern District of New York for a senior associate.

Moosnick billed her time at a rate of $310.00 per hour to the Local 1 Funds and the National Funds. (*Id.* ¶ 17.) This is above the range of rates recognized as reasonable in the Eastern District of New York for a junior associate. In another ERISA matter from 2023, this Court reduced Moosnick's rate to $200.00, the rate of a junior associate. *Dr. Gerald R. Finkel v. IDL Commc'n. & Elec., Inc.,* No.

22-CV-5889 (NRM)(RML) 2023 WL 4565403 at *5 (E.D.N.Y June 20, 2023); *see also Trs. Of Ne. Carpenters Health, Pension, Annuity, Apprenticeship, & Labor Mgmt. Cooperation Funds v. CEI Contractors, Inc.,* No. 18-CV-3467 (JFB)(GRB), 2019 WL 117603, at *6 (E.D.N.Y. Jan. 7, 2019).   Accordingly, I respectfully recommend that Moosnick's hourly rate be reduced to $200.00.

In addition, V&A billed its legal assistants' time at a rate of $145.00 per hour prior to April 1, 2022 to the National Funds and prior to June 1, 2022 to the Local 1 Funds, and at a rate of $155.00 per hour after April 1, 2022 to the National Funds and after June 1, 2022 to the Local 1 Funds. (Grancio Decl. ¶ 18.)  This is above the range of rates recognized as reasonable in the Eastern District of New York.  I therefore respectfully recommend that the legal assistants' hourly rates be reduced to $90.00.  *See N.Y.C. Dist. Council of Carpenters,* 2018 WL 3785331 at *5.

### b. Hours Billed

"[T]he district court should exclude excessive, redundant or otherwise unnecessary hours ...." *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999).  In connection with their initial motion for default judgment, Plaintiffs' counsel requested a total of 45.7 hours billed in this matter.  (Dkt. 31-6.)  In connection with the renewed Motion, Plaintiffs' counsel now requests a total of 84.09 hours billed in this matter.  I respectfully recommend that Plaintiffs' counsel not be permitted to bill for hours incurred in amending Plaintiffs' initial motion for default judgment.  Had Plaintiffs' counsel prepared the initial motion properly, it would not have been necessary to incur additional hours to file the Motion to correct those errors.  Moreover, the Motion contains many errors, both lingering and brand-new.  (*See* September 18, 2023 Scheduling Order), *Saavedra v. Twin Kitty Bakery Corp.*, No. 18-CV-932 (PKC) (PK), 2021 WL 1394487, at *18 (E.D.N.Y. Feb. 16, 2021), *R&R adopted*, No. 18-CV-932 (PKC) (PK), 2021 WL 1169321 (E.D.N.Y. Mar. 29, 2021) (noting that "[i]n determining the reasonableness of the requested attorneys' fees, the Court considers the quality of the work done by the attorneys," (citation omitted), then finding that deficiencies in plaintiffs' submissions, including

calculation errors, merited a reduction in their attorneys' fees); *LaBarbera v. J.E.T. Res., Inc.*, 396 F. Supp. 2d 346, 352 (E.D.N.Y. 2005) ("the court has discretion to reduce the amount if it determines that the hours and rate charged are superfluous or unreasonable.")   I, therefore, consider only the hours that Plaintiffs' counsel requested prior to preparing for the Court's July 5, 2023 inquest necessitated by deficiencies contained in the original motion for default judgment.

For the Local 1 Funds, pre-June 1, 2022, Harras worked 0.336 hours at a rate of $375.00 per hour for a total of $126.00; post-June 1, 2022, Harras worked for 0.84 hours at a rate of $410.00 per hour for a total of $344.40.  For the National Funds, pre-April 1, 2022, Harras worked 0.064 hours at a rate of $375.00 per hour for a total of $24.00; post-April 1, 2022, Harras worked 0.16 hours at a rate of $410.00 per hour for a total of $65.60.  (Grancio Decl. ¶ 15; Ex. QQ to Grancio Decl., Dkt. 46-6.)

For the Local 1 Funds, pre-June 1, 2022, Grancio worked 6.716 hours at a rate of $285.00 per hour for a total of $1,914.06; post-June 1, 2022, Grancio worked 24.1 hours at a rate of $310.00 per hour for a total of $7,471.00.  (Ex. QQ to Grancio Decl.)  For the National Funds, pre-April 1, 2022, Grancio worked 1.093 hours at a rate of $285.00 per hour for a total of $311.51; post April 1, 2022, Grancio worked 0.48 hours at a rate of $310.00 per hour for a total of $148.80.  (*Id.*)  For the Local 1 Funds, post-June 1, 2022, Moosnick worked 0.3 hours which, at a rate of $200.00 per hour, results in a fee of $60.00.  (*Id.*)

For the Local 1 Funds, legal assistants worked 17.748 hours; when calculated at a rate of $90.00 per hour, this results in a fee of $1,597.32.  (*Id.*)  For the National Funds, legal assistants worked 1.728 hours; when calculated at a rate of $90.00 per hour, this results in a fee of $155.52.  (*Id.*)

Accordingly, I respectfully recommend that Plaintiffs be awarded a total of $12,218.21 in attorneys' fees.

## 2. Costs

Plaintiffs request $844.57 in costs. (Grancio Decl. ¶ 21.)  An award of costs is mandatory under ERISA.  *See* 29 U.S.C. § 1132(g)(2)(D); *see also LJC Dismantling Corp.*, 400 F. Supp. 3d at 23.  The docket reflects that Plaintiffs paid the $402.00 filing fee, (Dkt. Entry 1, dated March 23, 2022), and Plaintiffs have provided documentation of $285.00 in fees related to service of process (Grancio Decl. ¶ 22; Ex. RR to Grancio Decl.).  Plaintiffs have also requested postage and docket review costs totaling $42.57 and have filed a postage rate sheet supporting their claimed amounts.  (Ex. QQ to Grancio Decl.; Ex. RR to Grancio Decl.)  These costs add up to $729.57.  Because Plaintiffs do not explain or support any other costs they are requesting (*see* Grancio Decl. ¶ 22), I respectfully recommend that Plaintiffs be awarded $729.57 in costs.

## CONCLUSION

Based on the foregoing, I respectfully recommend that the Motion be granted, and that Plaintiffs be awarded damages from Tri-C in the following amounts:

To the Local Funds:

1. Estimated contributions of $1,720,440.64 for the period July 1, 2019 through March 31, 2022, interest thereon of $519,218.01, and liquidated damages of $344,088.12;

2. Actual contributions totaling $38,659.55 for March 2022, interest thereon of $5,613.58, and liquidated damages of $7,731.91;

3. Estimated contributions of $425,270.67 for the period October 2022 through August 2023, interest thereon of $19,171.60, and liquidated damages of $85,054.13;

4. Estimated 401(k)/ASB-C deferrals for the weeks of November 9, 2021, August 30, 2022, October 25, 2022 – November 1, 2022, and November 15, 2022 – September 5, 2023 totaling $76,352.91, interest thereon of $3,991.00, and liquidated damages of $15,270.58;

5.  Administrative fees totaling $8,800.00;

6.  Lost earnings totaling $223.70;

7.  401(k)/ASB-C interest on file totaling $559.41;

8.  Pre-judgment interest at a rate of $619.38 per day from October 6, 2023 until the date judgment is entered; and

9.  Post-judgment interest.

To the UANPF:

1.  Contribution shortages of $834.33 for October 2021, interest thereon of $188.32, and liquidated damages of $83.43;

2.  Estimated contributions of $140,569.20 for January 2022 through August 2023, interest thereon totaling $14,072.32, and liquidated damages totaling $14,056.92; and

3.  Pre-judgment interest at a rate of $46.49 per day from October 6, 2023 until the date judgment is entered; and

4.  Post-judgment interest.

To the ITF:

1.  Contributions of $4,395.00 for the period January through August 2023, interest thereon totaling $439.98, and liquidated damages totaling $879.00; and

2.  Pre-judgment interest at a rate of $1.44 per day from October 6, 2023 until the date judgment is entered; and

3.  Post-judgment interest.

The above amounts shall be reduced by $85,000.00, as reflected in the settlement funds received pursuant to the agreement between Plaintiffs and PIIC.  In addition, I respectfully recommend that Plaintiffs be awarded attorneys' fees totaling $12,218.21 and costs totaling $729.57.

Any objection to this Report must be filed in writing with the Clerk of Court within fourteen (14) days of service. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to timely file any just objection waives the right to further judicial review of this Report and Recommendation. *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008).

**SO RECOMMENDED:**

*Peggy Kuo*

PEGGY KUO
United States Magistrate Judge

Dated:  September 10, 2024
        Brooklyn, New York